UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LITTLE RIVER BAND OF OTTAWA
INDIANS,

            Plaintiff,                               Case No. 1:09-cv-141

v.                                           HON. JANET T. NEFF

NATIONAL LABOR RELATIONS
BOARD,

            Defendant.
_____/

**OPINION AND ORDER**

Invoking this Court's jurisdiction under 28 U.S.C. §§ 1331 ("Federal question") and 1362 ("Indian tribes"), plaintiff Little River Band of Ottawa Indians filed this case for declaratory and injunctive relief against defendant, the National Labor Relations Board (NLRB), to prevent the NLRB from proceeding on the charge that plaintiff is engaged in an unfair labor practice prohibited by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, to wit, plaintiff's labor law prohibiting employees of its subordinate economic organizations, such as the Little River Casino Resort, from engaging in a strike. Now pending is plaintiff's Motion for Summary Judgment pursuant to FED. R. CIV. P. 56(a) (Dkt 33). Defendant filed a response in opposition, arguing for dismissal under FED. R. CIV. P. 12(b)(1) for lack of subject-matter jurisdiction (Dkt 35). Being fully advised by the parties' written and oral arguments, the Court determines that it does not possess jurisdiction over the subject matter of plaintiff's complaint; therefore, this Court grants defendant's request for dismissal of this action.

# I. BACKGROUND

## A. Statement of Facts[1]

### 1.     *The Little River Band of Ottawa Indians*

Plaintiff is a federally recognized Indian tribe.  25 U.S.C. § 1300k-2(a); Amended Verified Complaint (AVC) [Dkt 8] ¶ 1; Kimberly Alexander Affidavit [Dkt 34-2].  The tribe has nearly 4,000 enrolled members, who live in and near Manistee and Mason Counties in the State of Michigan. Ogema Larry Romanelli Affidavit [Dkt 34-3] ¶ 5.  In accordance with the Indian Reorganization Act (IRA), 25 U.S.C. § 476, plaintiff promulgated a Constitution, and amendments thereto, which was approved by the Secretary of the Department of Interior.  AVC ¶ 7; AVC Ex. A; Ogema Aff. ¶ 8; *see* 25 U.S.C. § 1300k-6(a)(1).

Pursuant to its Constitution, plaintiff is governed by an Executive Branch, through the office of the Tribal Ogema; a legislative branch, through the office of the Tribal Council; and a judicial branch, through the Tribal Court.  AVC ¶ 8; AVC Ex. A, Arts. IV-VI.  Its Constitution further provides that "[t]he Tribe's jurisdiction over its members and territory shall be exercised to the fullest extent consistent with this Constitution, the sovereign powers of the Tribe, and federal law." AVC Ex. A, Art. I, § 2.  The Constitution empowers the Tribal Council "[t]o exercise the inherent powers of the Little River Band by establishing laws through the enactment of ordinances and adoption of resolutions not inconsistent with the Constitution . . . to govern the conduct of members of the Little River Band and other persons within its jurisdiction."  *Id.*, Art. IV, § 7(a)(1).

---

[1]The Court's Statement of Facts is taken in large part from plaintiff's Statement of Undisputed Material Facts (Dkt 34) and defendant's response thereto (Dkt 35).

The United States, through the Secretary of Interior, has taken into trust on plaintiff's behalf over 1,200 acres of plaintiff's ancestral lands in and near Manistee and Mason Counties.  Ogema Aff. ¶ 7.  Plaintiff exercises governmental authority over the activities of tribal members and non-Indians on these trust lands.  AVC ¶¶ 12-25; Ogema Aff. ¶¶ 9-18, 20.  Plaintiff is successfully restoring its tribal community and lands, and the provision of governmental services to tribal members pursuant to the Restoration Act.  Ogema Aff. ¶¶ 6-12.  Plaintiff's Housing Department, for example, has built, and is continuing to build, reservation homes for low income and elderly tribal members.  Plaintiff's Health Department provides direct health care services to many tribal members and their families.  It is upgrading its clinic and building a pharmacy to better serve the tribal community.  Plaintiff's Department of Natural Resources is engaged in restoring sturgeon fish populations within the reservation.  Plaintiff is maintaining and restoring its language through Anishinaabemowin language programs for tribal member youths and elders, and plans are under way for the construction of a new Community Center and Government Building complex on the reservation to unify, and enhance services to, the tribal community.  *Id.* ¶ 11.

Lacking a tax base, plaintiff's governmental programs and services are jointly funded by (a) the generation of revenues pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*; and (b) federal support, principally through contracts entered into by plaintiff with federal agencies through the  Indian Self-Determination and Education Assistance Act of 1975, the Indian Health Care Improvement Act of 1976, and the Native American Housing Assistance and Self-Determination Act of 1996.  Plaintiff's IGRA gaming revenues generally provide $20 million per year in support of tribal government, which is over fifty percent of plaintiff's total budget.  The

3

remainder is covered primarily through a combination of the above-referenced federal programs. Ogema Aff. ¶ 12.

Over 1,000 employees work for plaintiff's governmental departments, agencies, commissions, and subordinate organizations, including tribal members and members of their immediate families, members of other Indian tribes, and non-Indians. Plaintiff's laws provide that qualified tribal members, their immediate family members, and members of other Indian tribes are given employment preferences within tribal government operations over non-Indians. Ogema Aff. ¶ 13.

**2.      *The Little River Casino Resort***

The Band conducts IGRA gaming operations on its reservation through a subordinate economic organization of the Band known as the Little River Casino Resort ("the Casino"), which is established by the Tribal Council pursuant to plaintiff's Constitution. AVC ¶ 26; Ogema Aff. ¶¶ 14-15; Ex. D. The Casino is wholly owned and organized by plaintiff. AVC ¶ 26; AVC Ex. D; Ogema Aff. ¶¶ 15, 17. The Tribal Council retains sole authority to waive or limit the sovereign immunity of the Casino, to approve legal counsel for the Casino, and to approve contracts for part-time or full-time personnel; and all obligations, liabilities and property related to or concerning the Casino are those of the Tribe. AVC ¶ 26; Ogema Aff. ¶ 16. The Casino is managed by a Board of Directors, who, by the terms of plaintiff's Constitution and Board of Directors Act, are nominated by the Ogema, subject to confirmation by the Tribal Council. AVC Ex. A, Art. IV, § 7(h), Art. V, § 5(a)(4); AVC Ex. D, § 4.02(a)-(b). Board members must be enrolled members of the Tribe. AVC Ex. D, § 4.04(a). The Ogema has the power to remove a Board member for cause, unless overruled by a two-thirds majority vote of the Tribal Council. *Id.*, § 4.02(c).

Pursuant to plaintiff's Board of Directors Act, the Ogema must present the annual budget of the Casino to the Tribal Council for approval or amendment in accordance with plaintiff's Constitution.  AVC Ex. D, §§ 5.02(a) and 5.03(a).  Pursuant to the Act, the Casino's annual operating plan "shall be subject to approval by the Tribal Council by law or resolution."  *Id.* § 5.03(b).  Pursuant to the Act, the Casino Board must account for, and transfer to the accounts of the Tribal Council, all revenues generated by the Casino in accordance with Board procedures, which "shall be subject to modification by the Tribal Council by law or resolution." *Id.* § 5.01(c).  Pursuant to the Act, the Casino Board has authority to approve and amend the Personnel Manual for the Casino, "subject to the overriding authority of the Tribal Council to alter such Personnel Manual by law or resolution," and the Casino Board is required to "provide at least a 30-day advance notice to the Ogema and Tribal Council of all proposed amendments to the Personnel Manual." *Id.* § 5.03(d).

The Casino Board may hire a General Manager for the Casino "in accordance with the laws and resolutions of the Tribe" and enter into an employment contract with the General Manager, provided "that such contract shall be subject to ratification by the Tribal Council." *Id.* § 5.03(c).

Plaintiff's IGRA gaming operations at the Casino employ tribal members, members of their immediate families, and members of other Indian tribes as well as several hundred non-Indians. Ogema Aff. ¶ 18.  Many non-Indians (in the thousands per year) come from outside of the Band's reservation, from Michigan and other states, to engage in gaming at the LRCR, and the opportunity for such gaming is advertised to non-Indians outside of the reservation. Ogema Aff. ¶ 19.

Pursuant to its Constitution, plaintiff enacted a Fair Employment Practices Code to govern employment and labor relations within its regulatory jurisdiction.  AVC ¶ 12; AVC Ex. B; Ogema

Aff. ¶ 20.  Article XVI of the Fair Employment Practices Code governs labor relations and collective bargaining with "public employers" within its jurisdiction.  *See* AVC Ex. B, Art. XVI § 16.03 (definitions); AVC ¶¶ 14, 22-25; Ogema Aff. ¶ 20.

Plaintiff defines "public employer" as "a subordinate economic organization, department, commission, agency, or authority of the Band engaged in any Governmental Operation of the Band." AVC Ex. B, Art. XVI, § 16.03.  "Governmental Operations of the Band," in turn, are defined as

> the operations of the Little River Band of Ottawa Indians exercised pursuant to its inherent self-governing authority as a federally recognized Indian tribe or pursuant to its governmental activities expressly recognized or supported by Congress, whether through a subordinate economic organization of the Band or through a department, commission, agency, or authority of the Band including, but not limited to (1) the provision of health, housing, education, and other governmental services and programs to its members; (2) the generation of revenue to support the Band's governmental services and programs, including the operation of "Class II" and "Class III" gaming through the Little River Casino Resort; and (3) the exercise and operation of its administrative, regulatory, and police power authorities within the Band's jurisdiction.

*Id.*

Hence, pursuant to its Constitution and Article XVI, plaintiff regulates labor relations and collective bargaining matters, involving both tribal member employees and non-Indian employees within its reservation gaming operations conducted pursuant to the IGRA.  AVC ¶¶ 19, 21-26; Ogema Aff. ¶¶ 14-18, 20.  The NLRB does not dispute the fact that plaintiff has enacted a law—Article XVI of the Band's Fair Employment Practices Code—that purports to regulate the labor relations of "public employers," and that the Casino falls within the tribal law's definition of "public employer"; however, the NLRB does not accede to plaintiff's legal conclusion implying that the labor relations of the Casino fall within plaintiff's regulatory jurisdiction.  NLRB Resp. to Pl. Statement of Undisputed Material Facts [Dkt 35-2] ¶¶ 13-18.

6

Article XVI prohibits concerted action by public employees against the governmental operations of the Band in the form of strikes, work stoppages or slow downs. AVC Ex. B, §§ 16.03 (definitions of "strikes" and "Governmental Operations of the Band"), 16.06 (strikes prohibited). It also prohibits lock-outs by public employers. *Id.*, §§ 16.03 (definition of "lock-outs"), 16.07 (lock-outs prohibited). Article XVI provides that collective bargaining impasses between public employees and public employers must be resolved through alternative dispute resolution processes. *Id.*, § 16.17. Plaintiff's Constitution empowers the Tribal Council to create by ordinance regulatory commissions or subordinate organizations and to delegate to such organizations the power to manage the affairs and enterprises of the Little River Band. AVC Ex. A, § 7(f).

**3.     *The Teamsters' Charge***

In contrast to plaintiff's labor law prohibiting employees of "subordinate economic organizations," such as the Casino, from "engag[ing] in a strike," AVC Ex. B, Art. XVI, the NLRA explicitly recognizes the right of employees covered by the Act to engage in lawful strikes, 29 U.S.C. §§ 157, 163. Further, the NLRA provides that covered employers who unlawfully interfere with the exercise of this right commit an unfair labor practice under § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).

On or about March 28, 2008, the International Brotherhood of Teamsters filed a "Charge Against Employer" before the NLRB, naming plaintiff as the "employer against whom the charge is brought." AVC Exs. E, H (subpoena with Teamsters' Charge), and J (letter and subpoenas with Teamsters' Charge). The Teamsters' Charge asserts that the Tribal Government "has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsection[] (1) . . . of

the National Labor Relations Act," 29 U.S.C. § 158(a)(1), and for the "facts constituting the alleged

unfair labor practice" the Charge states, in pertinent part, that plaintiff has

> promulgated the Constitution of the Little River Band of Ottawa Indians which on
> its face preempts the National Labor Relations Act jurisdiction.  Said Constitution
> of the Little River Band of Ottawa Indians among it [sic] articles reserves authority
> to govern labor relations including but not limited to regulating terms and conditions
> under which collective bargaining agreements may or may not occur.   The
> Constitution of the Little River Band of Ottawa Indians among other illegal articles
> denies employees the right to strike.  By this and other conduct the respondent has
> intimated [sic] employees and utilized the Constitution of the Little River Band of
> Ottawa Indians as a means to deny employees the right to organize as protected by
> Section 7 of the Act.

AVC Exs. E, H (subpoena with Teamsters' Charge), and J (letter and subpoenas with Teamsters'

Charge).

By a form letter dated March 28, 2008, NLRB Regional Director Stephen M. Glasser wrote

to plaintiff's Tribal Council Speaker, Donald Koon, indicating that the Teamsters' Charge had been

filed against plaintiff and that the case had been assigned to NLRB agent Craig Sizer.  AVC Ex. F.

By letter dated May 2, 2008, plaintiff's counsel wrote Glasser, opining that "such a claim is not

properly adjudicated by the Board" and that "[s]hould the International Brotherhood of Teamsters

or the Board seek to challenge the constitution or laws of the Little River Band of Ottawa Indians,

such a case should be brought in the federal district court."  AVC Ex. G.

On or about May 14, 2008, the NLRB issued a subpoena to Tribal Council Speaker Koon,

demanding his appearance to provide signed affidavit testimony in reference to the Teamsters'

Charge at the Grand Rapids office of the NLRB.  AVC ¶ 31, Ex. H.  By letter dated May 21, 2008,

the members of the Tribal Council of the Band wrote NLRB Regional Director Glasser, in response

to the subpoena, indicating that "[w]e will not subject our tribal government to the burdens of a

8

subpoena issued in a matter over which we believe the NLRB plainly lacks jurisdiction."  AVC Ex.

I; AVC ¶ 32.

The NLRB did not respond to the May 21, 2008 letter.  However, by letter dated November

5, 2008, NLRB Agent Sizer wrote plaintiff's counsel, enclosing subpoenas issued to Tribal Council

Speaker Koon and to the "Little River Band of Ottawa Indians Tribal Government, Attn: Custodian

of the Records" in reference to the Teamsters' Charge.  AVC ¶¶ 33-34; AVC Ex. J (subpoenas).  In

his letter, Sizer explained that he would

> mainly be seeking information from Mr. Koons [sic] relevant to the Board's
> jurisdiction in this matter and whether the Tribe and the Casino constitute a single
> employer.  Regarding the jurisdiction issue, I will be soliciting information to
> determine whether the Casino is an exclusively commercial venture generating
> income for the Tribe from the general public, whether the casino competes in the
> same commercial arena as other non-tribal casinos, whether it employs a significant
> number of non-tribal members, and whether it actively markets its operations to the
> general public.  Regarding the single employer issue, I will be soliciting information
> to determine whether the Tribe and the Casino constitute a single integrated
> enterprise by virtue of such factors as common ownership, common management,
> centralized control of labor relations, and interrelation of operations.

AVC Ex. J (letter).  The subpoenas were served upon the Band by certified mail and demanded

appearances of Tribal Council Speaker Koon and the Tribal Council's Records Custodian to provide

affidavit testimony and/or documents at the NLRB's Grand Rapids office.  AVC ¶ 34, Ex. J

(subpoenas).

Plaintiff's counsel wrote NLRB Regional Director Glasser a second time, in a letter dated

December 11, 2008, explaining why neither Tribal Council Speaker Koon nor the Tribal Council's

Records Custodian would appear to respond to the subpoenas.  Plaintiff's counsel wrote

> We understand from correspondence and communications with Board Agent, Craig
> Sizer, that the NLRB has issued the subpoenas in an attempt to establish its
> jurisdiction to proceed with this Charge.  In particular, we understand that the NLRB

9

asserts that it has authority to proceed with this Charge against the Tribal Government if it can establish:

(1) that the Band's gaming operations, through the LRCR [Little River Casino Resort], meet the standards for an "employer" set forth in the NLRB's decision in *NLRB v. San Manuel Bingo & Casino*, 341 N.L.R.B. 1055 (2004) (as applied in the Decision and Direction of Election in *In re: Soaring Eagle Casino and Resort* (GR-7-RC-23147), and

(2) that the relationship between the Tribal Government and the Band's IGRA gaming operations can be viewed "as a single integrated enterprise" under standards applied by the NLRB to assert authority over two or more private businesses. *See NLRB v. Palmer Donavin Mfg. Co.*, 369 F.3d 954, 957 (6th Cir. 2004).

With respect to the first issue, it is our position that the standards applied by the NLRB in *San Manuel* and *Soaring Eagle* are contrary to principles of federal Indian law. But even if the NLRB could successfully apply those standards to establish that the LRCR should be treated as an "employer" under the NLRA, the Band's promulgation of a Constitution and laws, in accordance with the IRA and federal Indian law principles, could never be deemed the conduct of an "employer" under the NLRA, rendering it subject to an unfair labor practice charge.

Thus, with respect to the second issue, it is the Tribal Government's position that the NLRB is seeking to exercise authority that is patently beyond the scope of its jurisdiction, that its right to do so is a pure question of law, that the NLRB has no expertise with respect this question because it turns on principles of federal Indian law, and that the Tribal Government would be irreparably harmed if it were forced to endure and exhaust NLRB unfair labor practice proceedings. . . .

AVC Ex. K, ¶ 35.

Plaintiff's counsel pointed out that "[t]he NLRB has a ready avenue to seek to establish that the Band's laws are preempted by the NLRA: an original action in the federal court," and opined that "the same cannot be accomplished under a notion that the Tribal Government's promulgation of a Constitution or laws can be deemed to be the conduct of an 'employer' and thereby subject to an NLRB unfair labor practice proceeding." According to plaintiff, "the NLRB can no more charge a tribal government with an unfair labor practice for promulgating a constitution or law than it could charge a state government with an unfair labor practice for the same." *Id.*

10

Finally, counsel stated that

> The Little River Band of Ottawa Indians Tribal Government is concerned that the
> NLRB's willingness to move forward with this Charge signals that it will continue
> to exert coercive measures against the Band in order to adjudicate what is, in reality,
> a preemption claim in the guise of an unfair labor practices proceeding.  For the
> reasons already stated, it is the Tribal Government's position that the NLRB is far
> outside the bounds of its authority in doing so.  Thus, it will not be producing
> Speaker Koon or a Custodian of its Records to respond to the subpoenas. Further, to
> alleviate the continuing threat of the NLRB's coercive assertion of authority in this
> matter, the Tribal Government asks that you inform it (through Speaker Koon) that
> the NLRB has withdrawn the subpoenas and the Charge.

*Id.*

The United States Department of the Interior (DOI) took a position on the brewing

jurisdictional issue.  The DOI, through its Office of the Solicitor, wrote to counsel for the NLRB

stating that the "DOI takes the position that, as a matter of Federal Indian law, the NLRB cannot

charge the Band with an unfair labor practice for its exercise of its sovereign authority in adopting

a constitution and enacting tribal labor laws."  The DOI further urged the Board "to put an end to

this enforcement action as soon as possible."  AVC Ex. L (1/15/2009 letter to Ronald Meisburg,

General Counsel for the NLRB, and John E. Higgins, Jr., Deputy General Counsel for the Board).

The NLRB disagreed with the views of the DOI.  The NLRB claimed authority to proceed

with the Teamsters' Charge against the Band if (a) the Band and its IGRA gaming operations at the

LRCR could be considered a "single employer" or a "joint employer" of employees who work at

the LRCR, and (b) "Board jurisdiction is appropriate under the principles of *San Manuel Indian*

*Bingo & Casino,* 341 N.L.R.B. 1055 (2004)," and further stated that "[i]f there is reasonable cause

to believe that the Band's promulgation and maintenance of the Ordinance tends to interfere with

Casino employee's exercise of Section 7 rights under the NLRA, 29 U.S.C. § 157, then the Regional

Director, in the name of the General Counsel, would likely issue an unfair labor practice complaint

against the Band."  AVC Ex. M (1/30/2009 letter from the NLRB, through its Associate General Counsel).

## B.  Procedural Posture

On February 18, 2009, plaintiff initiated this action by filing a two-count Verified Complaint for injunctive and declaratory relief against defendant.  Plaintiff filed an Amended Verified Complaint on April 2, 2009.[2]  Plaintiff seeks to have this Court enjoin defendant from proceeding against it and issue a declaratory judgment against defendant, "declaring that it has no authority to proceed against the Band, its Tribal Government, or any of the Band's officials, agents or representatives by means of an unfair labor practice case to challenge the Band's Constitution or laws, including Article XVI, governing labor relations within the Band's jurisdiction."  AVC ¶ 53(B).

On April 16, 2009, defendant filed a request for a Pre-Motion Conference (Dkt 13), seeking to file a motion to dismiss the Amended Verified Complaint pursuant to FED. R. CIV. P. 12(b)(1) for lack of subject-matter jurisdiction.  On April 20, 2009, plaintiff filed its own Pre-Motion Conference request (Dkt 16), seeking leave to file a motion for summary judgment of the Amended Verified Complaint under FED. R. CIV. P. 56(a).  Following a Pre-Motion Conference on May 22, 2010, the Court issued a briefing schedule, permitting plaintiff to file a dispositive motion addressing not only the grounds plaintiff proposed in its Pre-Motion Conference request but also anticipating the grounds for defendant's proposed challenge to this Court's exercise of jurisdiction over the subject matter.

---

[2]The exhibits referenced in the amended pleading are attached to the initial complaint.  *See* W.D. Mich. LCivR 5.7(d)(vii) ("Filers must not attach as an exhibit any pleading or other paper already on file with the Court, but shall merely refer to that document.").

On September 8, 2009, the parties filed the following motion papers:  plaintiff's Motion for Summary Judgment pursuant to FED. R. CIV. P. 56(a) (Dkt 33); defendant's response in opposition, arguing for dismissal under FED. R. CIV. P. 12(b)(1) (Dkt 35); plaintiff's reply (Dkt 36); and defendant's sur-reply (Dkt 37).  Additionally, on March 11, 2010, defendant filed a notice of a supplemental authority (Dkt 42), and plaintiff filed a response to the notice (Dkt 43).

Plaintiff alleges that defendant has provided no assurances that it will not proceed against it on the Teamsters' Charge.  AVC ¶ 38.  However, defendant represents to this Court that its General Counsel, out of respect for this Court and its processes, has "voluntarily deferred further action on the Teamsters' charge, which was originally filed in March 2008, until this Court issues a dispositive ruling in the instant case" (Dkt 37 at 19).  The Court heard oral argument on September 13, 2010 and now issues this Opinion and Order.

## II.  MOTION STANDARD

Plaintiff moves for summary judgment on its Amended Verified Complaint for declaratory and injunctive relief against defendant.  A moving party is entitled to a grant of its motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

However, as pointed out by defendant in its response to plaintiff's motion, a threshold question is whether this Court has jurisdiction over the subject matter of plaintiff's complaint, its request to review and enjoin the NLRB from proceeding upon the unfair labor practice charge filed against plaintiff (Dkt 35 at 7, 14).  If this Court lacks subject-matter jurisdiction, i.e., its very power

13

to hear this case, then the case "must" be dismissed. *See* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Plaintiff bears the burden of proving subject-matter jurisdiction. *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

## III. ANALYSIS

Plaintiff contends that this case presents the issue of "whether the NLRB can hale the Little River Band of Ottawa Indians before it to declare the Band's Constitution and laws governing public sector labor relations the unfair labor practices of a NLRA employer" (Dkt 33 at 6). Plaintiff asserts that it has properly brought the issue to this Court by invoking 28 U.S.C. §§ 1331 and 1362 as bases for this Court's subject-matter jurisdiction (*id.* at 7). For the reasons that follow, the Court holds that neither statute provides a proper basis for this Court's exercise of jurisdiction over the subject matter of plaintiff's complaint.

## A. Section 1331

Plaintiff argues that 28 U.S.C. § 1331 independently provides this Court with jurisdiction over an action brought by a sovereign facing mistreatment, mistreatment such as an alleged abusive use of agency power (Dkt 36 at 5, 17). Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Section 1331 does not, in and of itself, supply a substantive basis for federal jurisdiction. As defendant points out (Dkt 35 at 27-29), § 1331 merely gives the federal district court jurisdiction when a federal question arises *based on other federal law*. For this Court to exercise federal question jurisdiction under 28 U.S.C. § 1331, there must be a constitutional or federal statutory provision under which plaintiff is aggrieved. *See Gully v. First Nat'l Bank*, 299

U.S. 109, 112 (1936) ("To bring a case within [§ 1331], a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.").

In determining subject-matter jurisdiction, the federal court must look to see whether the plaintiff alleges a claim that actually "arises under" the Constitution or federal statutes. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *Bush v. State Indus., Inc.*, 599 F.2d 780, 784 (6th Cir. 1979). A plaintiff creates federal-question jurisdiction by means of a "well-pleaded complaint establish[ing] either that federal law creates the cause of action or that the plaintiff's right to relief . . . . depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for So. California*, 463 U.S. 1, 27-28 (1983). In short, § 1331 does not alone provide a right of entry into federal courts or otherwise contribute to the scope of jurisdiction of federal courts.

Despite this well-established rule of law, plaintiff argues that a decision of the Eleventh Circuit Court of Appeals supports a contrary conclusion. Plaintiff relies on the Eleventh Circuit's decision in *Florida Bd. of Bus. Regulation v. NLRB*, 686 F.2d 1362 (11th Cir. 1982), where the State of Florida and its Board of Business Regulation sought review of two rulings of the NLRB asserting jurisdiction, for purposes of representation election, over employees of Florida's jai alai industry. According to plaintiff, the Eleventh Circuit issued a "clear holding that the federal district court had jurisdiction to proceed on the State's request for declaratory judgment under section 1331 to prevent the NLRB from intruding into an industry over which it claimed to exercise substantial regulatory authority" (Dkt 36 at 16).

15

However, the Court agrees with defendant that the holding in *Florida Bd.* is not a "clear" holding in support of plaintiff's position here but a holding made on the unique facts of that case, to wit, that the State of Florida was "a plaintiff who cannot seek review of the Board's order in the Court of Appeals." *Florida Bd.*, 686 F.2d at 1370.  Plaintiff, in contrast, is an entity with access to the judicial review process set forth in the NLRA, as described *infra*.  Consequently, the Court is not convinced that the Eleventh Circuit's holding in *Florida Bd.* is properly extended to the facts of this case.

## B.  Section 1362

Similarly, 28 U.S.C. § 1362 does not alone provide a right of entry into federal courts. Section 1362 provides that "[t]he district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1362.

Section 1362 was passed in 1966 in order to give Indian tribes access to federal court on federal issues without regard to the $10,000 amount-in-controversy requirement then included in 28 U.S.C. § 1331, the general federal question jurisdictional statute discussed above.  *See Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545, 561 n.10 (1983).  Although Congress could have used different language, "Congress used 'arising under' language in section 1362 that is identical to that contained in section 1331."  *Gila River Indian Cmty. v. Henningson, Durham & Richardson*, 626 F.2d 708, 714 (9th Cir. 1980), *cert. denied*, 451 U.S. 911 (1981); *cf. Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 682 n.16 (1974) (declining to address the petitioners' argument that Congress "intended to expand the scope of 'arising under' jurisdiction in the District

Courts, beyond what judicial interpretations of that language have allowed under § 1331, for that category of suits brought by Indian tribes, in addition to eliminating the amount in controversy requirement when Indian tribes sue").  It is well established that invoking § 1362 does not change a plaintiff-tribe's duty to show that its complaint raises a substantial federal question.  *Sac & Fox Nation of Okla. v. Cuomo*, 193 F.3d 1162, 1166 n.3 (10th Cir. 1999) (citing *Western Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1058-59 (10th Cir. 1993)).

Plaintiff makes two arguments in its attempt to rebut this conclusion.  First, plaintiff points to the decision in *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 472-73 (1976), a decision plaintiff contends "clearly establishes that section 1362 uniquely protects Indian tribes as sovereigns" (Dkt 36 at 6).  However, the Court agrees with defendant that the discussion in *Moe* concerns standing, not subject-matter jurisdiction.  In *Moe*, the Court was faced with the question whether Indians claiming immunity from state taxes could seek an injunction against the state in light of 28 U.S.C. § 1341, which prohibits the district courts from enjoining state tax collection where there is a speedy remedy available in the state courts, unless the plaintiff is the United States.  The Court went on to conclude that because the United States was not barred from seeking an injunction by § 1341, and the United States could have sued on behalf of the Indians, the Indians were likewise free to proceed.  *Moe*, 425 U.S. at 474.  The Tenth Circuit, referencing *Moe*, recognized that § 1362 clearly removed some jurisdictional impediments for Indian tribes, but "it did not eliminate the requirement that there be a statutory or constitutional underpinning for the cause of action."  *Western Shoshone*, 1 F.3d at 1058-59.

Second, plaintiff argues that § 1362 uniquely protects Indian tribes as sovereigns (Dkt 36 at 5-6).  According to plaintiff, defendant fails to appreciate that the standard principles of statutory

construction do not have their usual force in cases involving Indian law (*id.*).  Plaintiff invokes an interpretative methodology that is sometimes referred to as "Indian law canons," which are rooted in "the unique trust relationship between the United States and the Indians."  *Oneida County v. Oneida Indian Nation (After Remand)*, 470 U.S. 226, 247 (1985).

In *Montana v.  Blackfeet Tribe*, 471 U.S. 759, 766 (1985), the United States Supreme Court recognized that in cases involving statutes that affect Indians and their trust relationship with the United States, the "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  The Sixth Circuit Court of Appeals has similarly recognized that "[t]he force of this interpretive canon can be overcome only when other circumstances evidencing congressional intent demonstrate that the statute is fairly capable of two interpretations . . . . [or] that the [conflicting] interpretation is fairly possible."  *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of U.S. Atty. for W. Dist. of Mich.*, 369 F.3d 960, 971 (6th Cir. 2004) (internal citations omitted); *see also United States v. Dion*, 476 U.S. 734, 739-40 (1986) (finding that "[w]hat is essential is clear evidence that Congress actually considered the conflict . . . .  and chose to resolve that conflict by abrogating the treaty").

Here, however, there is no ambiguity in the text of § 1362.  Rather, as previously stated, what is most telling about § 1362 is its adoption of the plain wording of the jurisdictional grant in § 1331.  *See Gila River*, 626 F.2d at 714; *Sac & Fox Nation*, 193 F.3d at 1166 n.3; *Western Shoshone*, 1 F.3d at 1058-59.  Where, as here, there are no "doubtful expressions to resolve," rejecting plaintiff's insupportably broad view of jurisdiction under § 1362 does not violate the canon that "statutes passed for the benefit of Indian tribes . . . are to be liberally construed."  *See Navajo Tribal Util. Auth. v. Ariz. Dep't of Revenue*, 608 F.2d 1222, 1233 (9th Cir. 1979) (internal quotation omitted).

18

Moreover, the Court observes that application of a canon that construes statutes in favor of Indian tribal sovereignty assumes relevance in a case where the government enacts a law that impedes tribal sovereignty. Section 1362 does not impede tribal sovereignty but was passed to give tribes access to the federal courts, albeit not to the extent plaintiff advocates here, but when the other jurisdictional requirements of that section are also met.

Last, the Supreme Court has consistently stated that the sovereignty that Indian tribes retain is of a unique and limited character, Congress has plenary authority to divest Indian tribes of any and all aspects of their sovereignty, whether those powers were retained by the tribes or established by treaty. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142-43 (1980) (cases cited therein); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978).

In short, just as plaintiff cannot invoke § 1331 without concomitantly stating a federal question, it also cannot assert subject-matter jurisdiction under § 1362 without concomitantly stating a federal question. Accordingly, the viability of plaintiff's cause of action depends on whether plaintiff has pleaded a federal question under the NLRA that this Court is empowered to hear.

### C. National Labor Relations Act

### 1. *Overview of the Act*

The declared purpose of the NLRA is to diminish the causes of labor disputes burdening and obstructing interstate and foreign commerce. 29 U.S.C. § 151 ("Findings and declaration of policy"); *Myers v. Bethlehem Shipbuilding Co.*, 303 U.S. 41, 44 (1938). In order to protect interstate and foreign commerce, the Act confers upon employees engaged in such commerce "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of

19

collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities."  29 U.S.C. § 157; *Myers*, 303 U.S. at 44.  The NLRA defines acts of an employer that shall be deemed "unfair labor practices," 29 U.S.C. § 158(a), and confers upon a five-member Board certain limited powers to prevent such practices, §§ 153, 160, including certain limited investigatory powers, § 161.

The Supreme Court "has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause."  *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963).  The language of § 2(2) of the Act "vests jurisdiction in the Board over any 'employer' doing business in this country save those Congress excepted with careful particularity."  *State Bank of India v. NLRB*, 808 F.2d 526, 531 (7th Cir. 1986).

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the NLRA provides the Board with "power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing." 29 U.S.C. § 160(b).  The Board is required to state its findings of fact and issue either an order requiring such person to cease and desist from such unfair labor practice or an order dismissing the complaint.  29 U.S.C. § 160(c).

The NLRA further provides the Board with power "to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order."  29 U.S.C. §

160(e).  Upon the filing of such petition, the court "thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board." *Id.*

Similarly, § 10(f) of the Act provides that any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order "in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside." 29 U.S.C. § 160(f).  The district court, other than as a forum to enforce subpoenas, 29 U.S.C. § 161(2), is not, by the terms of the Act, available as a forum for first redress.

## 2.  *Myers Exhaustion*

NLRA § 10(f), the provision providing exclusive jurisdiction in the courts of appeals over final orders from the Board, has been characterized as an exhaustion rule based upon the well established axiom that parties must exhaust their administrative relief before procuring judicial review. *Detroit Newspaper Agency v. NLRB*, 286 F.3d 391, 396 (6th Cir. 2002).  In *Myers*, 303 U.S. 41, the United States Supreme Court "reinforced" the purpose of vesting jurisdiction over such matters with the courts of appeal upon issuance of a final order by the Board.  *Detroit Newspaper*, 286 F.3d at 396.

In *Myers,* 303 U.S. at 44-45, the union made a charge to the NLRB that the defendant-shipbuilding corporation was engaged in unfair labor practices.  The NLRB notified the corporation that a hearing would be held to determine whether the corporation had engaged in any unfair labor practices, but the corporation instead filed suit in district court to enjoin the NLRB from holding the hearing.  *Id.* at 46.  The corporation claimed that the NLRA was inapplicable to its business "because the operations conducted there are not carried on, and the products manufactured are not sold, in interstate or foreign commerce."  *Id.* at 47.  The corporation asserted that the hearing would be "futile" and would cause it irreparable damage.  *Id.*  The district court entered the preliminary injunctions, and the United States Court of Appeals for the First Circuit affirmed the district court's orders.  *Id.* at 46-47.  The United States Supreme Court reversed, finding that the district court was without power to enjoin the NLRB from holding the hearing.

The Supreme Court held that the district court was without jurisdiction to enjoin hearings because the power to prevent any person from engaging in any unfair practice affecting commerce has been vested by Congress in the Board and the Circuit Court of Appeals, and Congress has declared:  "This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."  *Myers*, 303 U.S. at 48.   The Court explained that the NLRA

> establishes standards to which the Board must conform.  There must be complaint, notice and hearing.  The Board must receive evidence and make findings.  The findings as to the facts are to be conclusive, but only if supported by evidence.  The order of the Board is subject to review by the designated court, and only when sustained by the court may the order be enforced.  Upon that review all questions of the jurisdiction of the Board and the regularity of its proceedings, all questions of constitutional right or statutory authority are open to examination by the court.  We construe the procedural provisions as affording adequate opportunity to secure judicial protection against arbitrary action in accordance with the well-settled rules

applicable to administrative agencies set up by Congress to aid in the enforcement
of valid legislation.

*Id.* (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 46, 47 (1937)).  The Supreme Court

held that "the rule requiring exhaustion of the administrative remedy cannot be circumvented by

asserting that the charge on which the complaint rests is groundless and that the mere holding of the

prescribed administrative hearing would result in irreparable damage."  303 U.S. at 52.

### 3.  *As Applied to Indian Tribes*

The terms of the NLRA are silent as to whether Congress intended for the Act to include or

exclude Indians or Indian enterprises.  On its face, NLRA § 2(2) does not expressly exclude Indian

tribes from the Act's jurisdiction but merely defines "employer" as "any person acting as an agent

of an employer, directly or indirectly, but shall not include the United States or any wholly owned

Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof,

or any person subject to the Railway Labor Act."  29 U.S.C. § 152(2).  The term "person," in turn,

includes "one or more individuals, labor organizations, partnerships, associations, corporations, legal

representatives, trustees, trustees in cases under Title 11, or receivers."  29 U.S.C. § 152(1).  As

observed by the United States Court of Appeals for the District of Columbia Circuit in *San Manuel*

*Indian Bingo & Casino v. NLRB*, 475 F.3d 1306 (D.C. Cir. 2007), Congress, in promulgating the

NLRA, "in all likelihood never contemplated the statute's potential application to tribal employers,

and probably no member of that Congress imagined a small Indian tribe might operate like a closely

held corporation, employing hundreds, or even thousands, of non-Indians to produce a product it

profitably marketed to non-Indians."  *Id.* at 1311.

In exercising its regulatory jurisdiction, the Board has contended that it has not employed

a "categorical exemption of Indians" nor found appropriate a "blanket assertion of jurisdiction."  *San*

*Manuel Indian Bingo & Casino*, Cases 31-CA-23673 & 31-CA-23803, 341 N.L.R.B. 1055, *1062-63, 2004 WL 1283584 ** 13 (May 28, 2004), *aff'd* 475 F.3d 1306 (D.C. Cir. 2007). Rather, the Board has found that "[a]t times, the tribes continue to act in a manner consistent with that mantle of uniqueness . . . . primarily when they are fulfilling traditionally tribal or governmental functions that are unique to their status as Indian tribes," and, in those circumstances, the Board has found that its interest in effectuating the policies of the NLRA is "likely to be lower." 341 N.L.R.B. at *1063.

Conversely, "[w]hen Indian tribes participate in the national economy in commercial enterprises, when they employ substantial numbers of non-Indians, and when their businesses cater to non-Indian clients and customers, the tribes affect interstate commerce in a significant way." *San Manuel,* 341 N.L.R.B. at *1062. When the Indian tribes act in this manner, the Board has determined that "the special attributes of their sovereignty are not implicated" and that its assertion of discretionary jurisdiction over Indian tribes acting in these circumstances would effectuate the policies of the Act while doing little harm to the Indian tribes' special attributes of sovereignty or the statutory schemes designed to protect them." *Id.* at *1062-63. In short, the Board has indicated that its jurisdictional determination requires careful balancing, on a case-by-case basis, to serve both "its interests in effectuating the policies of the Act and in according proper respect to the unique status of Indian tribes." *Id.* at *1063.

The Board's case-by-case analysis has its genesis in the decision of the United States Supreme Court in *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99 (1960), as narrowed by exceptions described by the Ninth Circuit Court of Appeals in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (9th Cir. 1985). In *Tuscarora,* the United States Supreme Court stated "it is now well settled by many decisions of this Court that September 13, 2010a general statute in terms

24

applying to all persons includes Indians and their property interests."  362 U.S. at 116.  *In Coeur d'Alene*, the Ninth Circuit characterized the principle from *Tuscarora* as a "general rule" and held that federal statutes of general applicability that are silent as to the applicability of their provisions to Indian tribes apply to tribal enterprises unless one of three exceptions applies: "(1) the law touches 'exclusive rights of self-governance in purely intramural matters;' (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties;' or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations.'"  751 F.2d  at 1116 (citing *United States v. Farris*, 624 F.2d 890, 893-94 (9th Cir. 1980), superceded by the IGRA as recognized in *United States v. E.C. Investments, Inc.*, 77 F.3d 327 (9th Cir. 1996)).

As pointed out by the district court in defendant's supplemental authority, whether the statement in *Tuscarora* may be properly characterized as dictum has had "little effect on courts' willingness to adopt its language as a 'general rule.'"  *NLRB v. Fortune Bay Resort Casino*, 688 F. Supp. 2d 858, 867 (D. Minn. 2010) (subpoena enforcement action).  *Cf. NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1196, 1199 (10th Cir. 2002) (en banc) (finding *Tuscarora* factually distinguishable inasmuch as *Tuscarora* concerned a tribe's "proprietary interests" and its "sovereign interests" and determining that the correct presumption is instead that "silence does not work a divestiture of tribal power").

Given that the *Tuscarora/Coeur d'Alene* test accommodates notions of both tribal and federal sovereignty, many circuits have applied the *Tuscarora/Coeur d'Alene* test to determine the scope of federal laws of general applicability.  *See San Manuel*, 475 F.3d at 1315 (concluding that "the NLRA does not impinge on the Tribe's sovereignty enough to indicate a need to construe the statute

narrowly against application to employment at the Casino"); *Fla. Paraplegic Ass'n v. Miccosukee Tribe of Indians*, 166 F.3d 1126, 1128-30 (11th Cir. 1999) (concluding that the ADA applies to Indian tribes); *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 177-82 (2d Cir. 1996) (concluding that OSHA applies to Indian tribes); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 932-36 (7th Cir. 1989) (applying ERISA to an employee benefits plan established and operated by an Indian tribe). *See also Equal Employment Opportunity Comm. v. Fond du Lac Heavy Equip. and Const. Co., Inc.*, 986 F.2d 246, 249 (8th Cir. 1993) (applying *Tuscarora/Coeur d'Alene* test to hold in the ADEA case that "[f]ederal regulation of the tribal employer's consideration of age in determining whether to hire the member of the tribe to work at the business located on the reservation interferes with an intramural matter that has traditionally been left to the tribe's self-government"). The Sixth Circuit Court of Appeals has not addressed the applicability of the *Tuscarora/Coeur d'Alene* test.

Again, defendant has not yet decided whether to exert its discretionary jurisdiction over plaintiff on the unfair labor practice charge giving rise to this case, and, unless plaintiff may properly bring the jurisdiction question to this Court, this Court is not empowered to decide the question in the first instance. Without subject-matter jurisdiction, any order this Court issues is meaningless and void.

### 4. *No Federal Question*

Having decided that invoking 28 U.S.C. § 1331 and § 1362 does not alone establish subject-matter jurisdiction, plaintiff must create federal-question jurisdiction by means of a well-pleaded complaint establishing either that the NLRA creates its cause of action or that its right to relief depends on resolution of a substantial question of federal law. *See Franchise Tax Bd.*, 463 U.S. at 27-28. Plaintiff's argument is clearly not that the NLRA creates its cause of action but that its right

to relief depends on resolution of a substantial question of federal law, to wit, whether defendant may properly proceed against it. Plaintiff concedes that defendant could bring an original action to claim preemption, *see, e.g.*, *NLRB v. State of Florida*, 868 F.2d 391 (11th Cir. 1989), or challenge tribal law, *see, e.g.*, *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002); however, plaintiff vigorously argues that defendant cannot, "without a clear directive from Congress," adjudicate such a claim against it through an administrative agency proceeding (Dkt 33 at 8).

Defendant responds that the agency proceeding is precisely the first forum for plaintiff's jurisdictional challenge and that plaintiff, like the tribe in *San Manuel*, may thereafter raise its objections in an appropriate court of appeal on judicial review of a final Board order pursuant to the procedures set forth in § 10(f) of the Act, 29 U.S.C. § 160(f) (Dkt 35 at 9, 16-19). Defendant argues that plaintiff's efforts to secure injunctive and declaratory relief in an ancillary district court proceeding run headlong into a multitude of binding and persuasive authorities consistently following the Supreme Court's decision in *Myers* (Dkt 35 at 26).

Plaintiff argues that the *Myers* exhaustion doctrine does not destroy "this Court's § 1362 subject-matter jurisdiction;" rather, § 1362 fully sustains this Court's jurisdiction to proceed to protect the unique interests of an Indian tribe in the face of an exhaustion challenge (Dkt 36 at 10). However, for the reasons previously stated, plaintiff's argument lacks merit as § 1362 is not alone a substantive basis for this Court's jurisdiction.

Plaintiff also argues that it is the proceeding itself, not the outcome or the enforcement of any final order of a circuit court of appeals, which will cause plaintiff harm (Dkt 36 at 9). However,

this argument has been rejected numerous times, most notably in *Myers* itself.[3]  *See Myers*, 303 U.S. at 51-52.  *See also Detroit Newspaper*, 286 F.3d at 401 (holding that the district court erred in finding subject-matter jurisdiction existed on the basis that the employers would suffer harm by having to litigate the matter as a basis "without foundation in the jurisprudence"); *Sears, Roebuck & Co. v Solien (Solien III)*, 450 F.2d 353 (8th Cir. 1971) (mere assertion of illegality of practice of NLRB regional director, when full NLRB and appellate review is available, was insufficient to grant federal district court subject matter jurisdiction in face of doctrine of exhaustion of administrative remedies).

Moreover, as defendant points out, plaintiff's asserted basis for jurisdiction, *i.e.,* its alleged injury to tribal sovereignty caused by unfair labor practice proceedings, is fundamentally at odds with Congress' determination that no injury occurs until after the Board issues a final order, at which time circuit court review is available pursuant to § 10(f), 29 U.S.C. § 160(f) (Dkt 37 at 10).[4]  *See*

---

[3]Interestingly, the argument was also rejected before the Supreme Court issued its decision in *Myers.  See, e.g., Lyons v Eagle-Picher Lead Co.*, 90 F.2d 321, 323 (10th Cir. 1937) (in an employer's suit to enjoin the NLRB, its members, its trial examiner, and its attorney from prosecuting an unfair labor practice complaint and enforcing the statute against it, the district court granted a temporary injunction on the ground that the employer's operations did not affect interstate commerce, but the court of appeals remanded with directions to dismiss the bill, determining that the NLRB was "proceeding within its lawful powers"); *Carlisle Lumber Co. v Hope*, 83 F.2d 92, 92 (9th Cir. 1936) (in an employer's suit to enjoin an NLRB Regional Director from considering an unfair labor practice complaint where the employer asserted it was not engaged in interstate commerce, the court of appeals denied the application for a temporary injunction, saying that it was "not persuaded that irreparable injury would result to the appellant from the hearing before the Board where the order of the Board is without force until a hearing before a court and an order of the court based thereon").

[4]Defendant also asserts that even if Congress had not so determined, plaintiff's claim of injury to sovereignty is illusory inasmuch as a determination by the Board that plaintiff qualifies as an NLRA "employer" would not in any way diminish plaintiff's ability to continue to act as a government (Dkt 37 at 10).

*Western Shoshone*, 1 F.3d at 1058-59 n.4 ("plaintiffs cannot claim the administrative process is inadequate until they attempt to invoke it").  Defendant correctly points out that an appellate court would, in any event, deny the NLRB's petition for enforcement if it were persuaded that defendant lacked jurisdiction over plaintiff's activities (Dkt 35 at 19).

Plaintiff has simply not established federal-question jurisdiction. The NLRA does not create a cause of action for a plaintiff in federal district court.  To the extent plaintiff's right to relief depends on resolution of a substantial question of federal law, namely, the NLRB's exercise of jurisdiction over it, that question is properly decided by the NLRA in the first instance, then the court of appeals.  This Court lacks jurisdiction to prevent the NLRB from proceeding on the charge that plaintiff is engaged in an unfair labor practice.

Because this Court lacks jurisdiction over the subject matter of plaintiff's complaint, plaintiff's motion for summary judgment of the complaint is moot.  Determination of the validity of a claim is, in itself, an exercise of jurisdiction.  *See Moir*, 895 F.2d at 269 (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

### III.  CONCLUSION

For the foregoing reasons, the Court grants defendant dismissal of plaintiff's Amended Verified Complaint pursuant to Fed. R. Civ. P. 12(b)(1) & (h)(3) for lack of subject-matter jurisdiction, and the Court therefore denies as moot plaintiff's Motion for Summary Judgment (Dkt 33).  As the Court's decision resolves all pending claims, a Judgment will be entered consistent with this Opinion and Order.  *See* Fed. R. Civ. P. 58.

Accordingly:

**IT IS HEREBY ORDERED** that this case is DISMISSED pursuant to FED. R. CIV. P. 12(b)(1) & (h)(3) for lack of subject-matter jurisdiction.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Summary Judgment (Dkt 33) is DENIED as moot.

DATED: September 20, 2010

 /s/ Janet T. Neff                              
JANET T. NEFF
United States District Judge